PHALEN and others *against* CLARK and another:

#### IN ERROR.

If a plaintiff seeking to recover a claim, can establish it, only through the medium of an illegal agreement between himself and the defendant, he must fail; but if the cause of action be unconnected with such illegal agreement, and founded upon a distinct and collateral consideration, a recovery may be had.

*A,* the assignee of a lottery, granted by the state of *Rhode-Island,* and the proprietor of all the tickets in such lottery, not sold at the time of drawing, entrusted *C,* residing at *Hartford,* in this state, who then was, and for a long time had been, the agent of *A,* for the sale of tickets in such lottery, with a large number of tickets, to sell or return, which were held by *C,* as the agent of *A,* at the time of the drawing of the lottery. One of the tickets so held by *C,* drew a prize of 30,000 dollars. By a fraudulent combination with *D, C* obtained information of that fact, in advance of the mail, and, in his return of sales to *A,* included such prize ticket, as sold to *D* before the drawing. *C* and *D* afterwards caused this ticket to be presented to *A* for payment of the prize, representing *D* as the *bona fide* owner thereof; and *A,* being ignorant of the fraud, thereupon paid the prize. On a bill in chancery, brought by *A,* against *C* and *D,* to recover back the money so paid, it was held, that the agency of *C to sell,* terminated with the drawing of the lottery, and he thereupon became a mere depositary; that the fraudulent combination between *C* and *D,* and the consequent injury to *A,* were entirely independent of any act in which *A* had participated, prohibited by the laws of this state; and consequently, that *A* was not precluded from a recovery, on the ground of his being *in pari delicto.* [One judge dissenting.]

A court of equity has jurisdiction to relieve against every species of fraud; and in many cases, concurrently with a court of law.

Generally, courts of equity consider the statutes of limitations as obligatory upon them, when they are called upon to enforce only legal rights.

But where the defendant, having perpetrated a fraud to the injury of the plaintiff, which, if prosecuted in due season, would have entitled him to relief, carefully and fraudulently concealed from the plaintiff all knowledge of the truth of the facts in question, for such a period, that the statute of limitations would bar a remedy in a court of law; it was held, that the plaintiff, under these circumstances, was not precluded from relief in equity, by lapse of time. [One judge dissenting.]

*Qu.* Whether an action at law, under such circumstances, would be barred.

THIS was a bill in chancery, seeking the recovery of a sum of money paid by the plaintiffs to the defendants, or one of them, on a prize-ticket. The bill stated the following case.

That on the 16th of *January,* 1841, the plaintiffs became, by assignment of one *Philip Case,* the proprietors and managers of a certain lottery, before that time duly authorized

*Hartford,*
*June, 1849*

Phalen
*v.*
Clark.

and granted, by an act of the general assembly of the state of *Rhode-Island,* passed at the session thereof in *January,* 1839, entitled "An Act to authorize *Philip Case,* his heirs, executors, administrators or assigns, to put forth a lottery for the benefit of public schools;" in and by which act it was, among other things, enacted, that said *Philip Case,* his heirs, &c., were thereby authorized and empowered to make and set forth a lottery, upon such scheme or schemes, and in one or more class or classes, as he or they might deem fit; such lottery to be under the management of one or more managers, to be approved of, by the governor; who should, previously to executing any scheme or class therein, give bond, with sureties, to the general treasurer, and his successor, in the sum of 50,000 dollars, conditioned to accept and comply with the provisions and requirements of said act; to pay all prizes, which might be drawn, in any class or scheme; to comply with all present existing acts in relation to lotteries, except such as were thereby altered; and also for the faithful execution of the trust; and that all schemes or classes in said lottery should be numbered, published and drawn, under the superintendence of the secretary of state, as provided in and by the several public acts of said state in relation to lotteries; and that the prizes in said lottery, should be equal to the whole amount of the tickets therein, at the prices fixed in the schemes thereof, and be subject to a deduction not exceeding fifteen *per cent.;* that the plaintiffs, being thus the proprietors of said lottery, and managers thereof, duly approved by the governor of said state, and having given bond with sureties, in manner and form as is required by said act, and having, in all other respects, complied with the requirements thereof, had, before said 16th of *January,* 1841, pursuant to the authority contained in that act, duly issued a scheme of said lottery, being class No. 250, sixth series, to be drawn on said day, in and by which scheme it was provided and declared, that sixty-six numbers should be deposited in the wheel to be drawn from, on said day, and that the ticket in said lottery having on it, as a combination, the first, second and third drawn numbers, should be entitled to the capital prize of thirty-thousand dollars, if demanded of the plaintiffs, (by whom all the tickets of said lottery and class

were issued, as managers thereof, and who were responsible for the payment of all prizes which might be drawn thereby,) within twelve months after the drawing, subject to a deduction of fifteen *per cent.*, payable forty days after the drawing of said class: that a large number of tickets having on them respectively, but each differing from the others, a combination of some three of said sixty-six numbers, were issued, by the plaintiffs, as managers aforesaid, and among them a ticket having on it the following combination of said numbers, *viz.* 3, 41, 46, with a declaration on each of said tickets, made by the plaintiffs, as managers, that such ticket would entitle the holder to such prize as might be drawn to its numbers, if demanded within twelve months after the drawing, subject to a deduction of fifteen *per cent*, payable forty days after the drawing thereof, which it was thereon declared, would take place *January* 16th, 1841, to be conducted by the secretary of state ; whereby, and by reason of the premises, the plaintiffs, as such managers and proprietors of said lottery, became responsible for the payment, to the *bona fide* holder and owner thereof, of all such prizes as were drawn by any ticket in said lottery, on said day, which had before then been sold, by the plaintiffs, or should thereafter be sold, by their agents, duly authorized thereto, according to the tenor and effect of the declaration made therein, by the plaintiffs, as managers: and the plaintiffs continued themselves to be the proprietors of all the unsold tickets in said lottery, at the time of the drawing thereof, on the 16th of *January*, 1841, when such drawing in fact took place, according to the terms of said scheme.

The bill further stated, that *Daniel W. Clark*, one of the defendants, at the time of the drawing of said lottery, on the 16th of *January*, 1841, was, and for a long time before had been, the agent of the plaintiffs for the sale of tickets in said lottery, and as such agent, had been entrusted with a large number of tickets, by the plaintiffs, in the class aforesaid, including, among others, the tickets herein before mentioned, containing the combination numbers 3, 41, 46; which tickets were held, by said *Clark*, as the agent of the plaintiffs, and remained in his possession, at *Hartford*, as the property of the plaintiffs, at the time of the drawing of said lottery, on the day and year last aforesaid, at *Providence*, in

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

the state of *Rhode-Island :* that at the drawing aforesaid, said ticket containing the combination aforesaid, drew, and was then and there publicly declared, in the presence and hearing of *Sidney Pinney*, one of the defendants, by *Henry Bowen*, Esq., then secretary of state of the state of *Rhode-Island*, under whose superintendence said lottery was drawn, and by the persons engaged in the drawing of said lottery, to have drawn the capital prize of 30,000 dollars, thereby entitling the holder and *bona fide* owner thereof, to demand and receive of and from the plaintiffs, as managers, the payment of said sum of money, at the expiration of forty days therefrom, subject only to a deduction of fifteen *per cent.*, whereby said ticket, immediately after the drawing of said lottery, became and was of great value to the plaintiffs, to whom the same belonged as aforesaid, *viz.*, of the value of 25,500 dollars : that after the drawing of said lottery, on the 16th of *January*, 1841, at *Providence*, and after the closing of the sales on that day, said ticket having on it the combination aforesaid, remained unsold, and in the possession of the defendant, *Clark*, at *Hartford*, as the property of the plaintiffs, together with divers other tickets in the same lottery and class, all of which had been entrusted to said *Clark*, as agent of the plaintiffs, to sell, or return the same, or an account thereof, of so many of said tickets as should remain unsold in his hands, at the close of his sales, on the day of the drawing of said lottery, to the plaintiffs at *Providence*, by mail ; that at and about the period of the drawing of said lottery, and during the time of the agency of said *Clark* as aforesaid, the arrangement and course of the mails between *Hartford* and *Providence* was such, that letters deposited in the post-office at *Hartford*, immediately after the close of the sales on every day of the week, except *Saturday*, would be transmitted to *Providence*, on the following day ; but as no mail was dispatched from said post-office for *Providence*, on *Sundays*, letters deposited in the post-office at *Hartford*, after the close of the sales on *Saturday* evening, were not transmitted any sooner than those which were deposited on the evening of the following day, and by reason thereof, it had become the usage of the defendant *Clark*, as he represented to the plaintiffs, to deposit in the post-office on *Sunday* evening, instead of *Saturday*, a list of the tickets remaining unsold in his

*Hartford,*
June, 1849.
———
Phalen
*v.*
Clark.

hands, at the closing of the sales on *Saturday* evening, of the classes drawn on *Saturdays*, at *Providence;* and inasmuch as the plaintiffs were aware, that there was no mail from *Providence* after the drawing of the lottery on *Saturday*, until the *Monday* following, by means of which, information of the result of the drawing could be transmitted to *Hartford;* and as there could be no sales after the closing of the sales on *Saturday*, the plaintiffs were accustomed to receive and confide in the returns, so made by said *Clark*, and deposited in the post-office at *Hartford*, on *Sunday*, of their tickets remaining unsold at the close of the sales on *Saturday* evenings, without any suspicion, on the part of the plaintiffs, of any fraudulent designs of said *Clark:* that said *Clark*, availing himself of the facilities afforded him thereby, and contriving and intending, by means thereof, to deceive and defraud the plaintiffs, secretly and fraudulently combined with the defendant *Pinney* for that purpose ; and in pursuance thereof, and with that intent, it was, on or about the 12th of *January*, 1841, at *Hartford*, arranged between them, that said *Pinney* should immediately proceed to *Providence*, and attend the public drawing of said lottery, on *Saturday*, the 16th day of *January* aforesaid, and on ascertaining the result thereof, should return, with great speed, to *Hartford*, and communicate the same to said *Clark*, in order that they might be enabled thereby, fraudulently to appropriate to their own use and benefit such of the unsold tickets belonging to the plaintiffs, in the hands of said *Clark*, as aforesaid, as they should, by means of the knowledge of the result of said drawing, so ascertained and communicated by said *Pinney*, discover in advance of the usual time for the transmission of his returns by said *Clark*, as aforesaid, to have drawn prizes of magnitude in said lottery, at the drawing aforesaid : that said *Pinney*, having, in pursuance of such fraudulent combination and confederacy, attended the drawing of said lottery, at *Providence*, on the 16th of *January* aforesaid, and ascertained the result thereof, and that said ticket containing and having on it the combination numbers 3, 41, 46, had drawn the capital prize, did immediately thereafter, as it had been concerted and agreed between them he should do, as aforesaid, return, with great speed, to *Hartford*, where he arrived, on the morning of *Sunday*, the 17th day of said *January*,

and then and there communicated the same to said *Clark*, who thereupon proceeded to examine, with said *Pinney*, the tickets of the plaintiffs so remaining in his hands unsold ; and on said examination, it was then and there discovered, by the defendants, that said prize ticket containing the combination numbers 3, 41, 46, was one of the tickets of the plaintiffs, so remaining unsold as aforesaid, and that the same had become, as the property of the plaintiffs, in the hands of the defendant *Clark*, of great value, *viz.*, of the value aforesaid : that thereupon said *Clark*, in pursuance of the fraudulent combination and confederacy aforesaid, afterwards, on the same day, prepared, under the false and fraudulent date of *January*, 16th 1841, and deposited in the post-office at *Hartford*, to be transmitted according to the usage aforesaid, by the mail of the following day, to the plaintiffs, a list of the tickets so remaining unsold in his hands, as the property of the plaintiffs, except a certain package of said tickets remaining unsold in his hands, No. 820, and containing, among others, the prize ticket having on it the combination numbers 3, 41, 46 ; which package and ticket were fraudulently omitted in said list, with the fraudulent intention of converting the same to the use of the defendants, and of concealing from the plaintiffs all knowledge of the fact, that the same remained unsold, with the rest of the tickets returned as aforesaid, as the property of the plaintiffs, in order that they, the defendants, might be thereby enabled so to dispose of said prize ticket as to defraud the plaintiffs of the amount thereof, and wrongfully and fraudulently to convert the same to their own use and benefit : that the more effectually to enable the defendants to deceive and defraud the plaintiffs, in the premises, it was then and there arranged between them, that the defendant *Pinney* should immediately take said tickets of the plaintiffs so omitted in said return, including said prize ticket having the combination aforesaid, to *Simsbury*, and there deliver it, in confidence, to one *Gaylord Pinney*, a cousin or near relative of the defendant *Pinney*, and induce him, upon some consideration, to receive and hold the same, ostensibly as the *bona fide* purchaser and owner thereof, but really in secret trust for said confederates, or for the defendant *Pinney*, for their use, and as such ostensible owner, to present said prize tickets to the plaintiffs for discount or pay-

ment of the amount thereof, and to account for the proceeds which should thus fraudulently be obtained, with the defendants, or one of them, for their use, in pursuance of said trust: that in pursuance of said arrangement, so fraudulently entered into, by the defendants, the defendant *Pinney* did immediately thereafter, *viz.*, on said 17th of *January*, 1841, proceed to *Simsbury*, and did then, about dusk, on said day, privately and in confidence deliver to said *Gaylord Pinney* said package, including said prize ticket of the plaintiffs, informing him, at the same time, that he had been to *Providence*, and was present at the drawing of said lottery as aforesaid, and that said ticket, having on it the combination aforesaid, had drawn the capital prize of 30,000 dollars; that he wished him, said *Gaylord Pinney*, to receive, and hold, and present the same to the plaintiffs, as the *bona fide* owner and holder thereof, but on a secret trust for the purpose aforesaid, at the same time assuring him that he should be well paid therefor: that thereupon said *Gaylord Pinney* did then and there receive said package, including said prize ticket of the plaintiffs, in pursuance of the fraudulent arrrangement so made by the defendants as aforesaid, and with full knowledge, by said *Gaylord Pinney*, of the premises, and of the fraudulent scheme of the defendants; that on the following day, the defendant *Pinney* again proceeded to *Simsbury*, accompanied by said *Clark*, to concert with said *Gaylord Pinney*, for the further prosecution of their fraudulent designs aforesaid, and then and there invited said *Gaylord*, to accompany them, on said day, to *Hartford*, which he did, for the purpose aforesaid; that said prize ticket was afterwards, on the same day, at the office of said *Clark*, in *Hartford*, placed in the hands of *A. S. Beckwith*, a broker, as the property of said *Gaylord Pinney*, by said *Clark*, to assist in the negotiation thereof, or in otherwise realizing the amount of said prize: that afterwards, on the 20th of *January*, 1841, at *Providence*, the plaintiffs, on the application of said *Beckwith*, in behalf of said *Gaylord Pinney*, as the *bona fide* holder and owner of said prize ticket, being wholly ignorant of the fraudulent schemes aforesaid, and of the fact that said ticket was really the property of the plaintiffs, and not of said *Gaylord Pinney*, discounted the same, and thereupon advanced and paid therefor, to said *Beckwith*, for said *Gaylord Pinney*, as the

plaintiffs supposed, as the *bona fide* holder and owner of said ticket, the sum of 24,750 dollars; which sum, the plaintiffs aver, was afterwards, at said *Hartford,* by said *Beckwith* and said *Gaylord Pinney,* paid over to the defendants, who then and there received the same, ostensibly in behalf of said *Gaylord Pinney,* but really for the purpose of converting the same to their own use and benefit, in pursuance of the fraudulent confederacy aforesaid, which the defendants then and there did; carefully and fraudulently concealing all knowledge thereof from the plaintiffs, who were thereby kept in entire ignorance thereof, for a period of more than six years thereafter, *viz.,* until on or about the 13th of *May,* 1847.

The plaintiffs finally averred, that by reason of the premises, they had been defrauded, by the defendants, of the whole amount so advanced by the plaintiffs for said ticket, in manner aforesaid, on the fraudulent procurement of the defendants, and of the interest thereon; and that the plaintiffs, by reason of the fraudulent concealment from them, by the defendants as aforesaid, of all knowledge thereof, and of their consequent ignorance of the premises, for the period aforesaid, are now remediless at law, and cannot have adequate relief, save in a court of equity, where matters of this kind and the like nature, are properly cognizable and relievable, and where the plaintiffs cannot be prejudiced in their just and equitable claim to relief in the premises, by reason of the lapse of time during which the fraudulent conduct of the defendants, was kept concealed from the knowledge of the plaintiffs, as aforesaid.

The suit was commenced the 28th day of *December,* 1847.

To this bill there was a general demurrer; and the superior court thereupon adjudged it insufficient, and rendered judgment for the defendants. The plaintiffs, by motion in error, then brought the case before this court for revision.

*Baldwin* and *Toucey,* for the plaintiffs, after remarking, that the bill presented *prima facie* a palpable case of equity, and they were unquestionably entitled to relief, unless they were precluded from seeking it, by some illegal act or fatal neglect of their own, contended, 1. That the cause of action was not founded on any illegal act, to which they were parties. They

innocently sent a ticket in a lottery authorized by the laws of *Rhode-Island,* to the defendant *Clark,* for sale ; but he never sold it ; and it remained, from first to last, the property of the plaintiffs. It was theirs, when the lottery was drawn; and they, *eo instanti,* became entitled to the prize. The injury to the plaintiffs was effected, not by a wrongful sale of the ticket to a *bona fide* holder, but by a fraudulent present-ment of a ticket never sold. The plaintiffs have done nothing in this state, in relation to this ticket, contrary to our laws. The prohibited act is the *sale* of the ticket, or *acting as agent* for its sale. *Stat.* 408. §2. (ed. 1838.) Here neither of those acts was done. But if otherwise, the injury com-plained of had no connexion with such acts,—*i. e.,* with any sale by *Clark,* or with any agency of his. The test of ille-gality as a defence, is, whether the plaintiffs, to entitle them to recover, require any aid from the illegal transaction. *Chitt. Cont.* 657. *Armstrong* v. *Toler,* 11 *Wheat.* 258. *Simpson* v. *Bloss,* 7 *Taun.* 246. 2 *Cr. Mees. & Rosc.* 313. In the cases relied on below, by the defendants, proof of the illegal transaction was indispensable to a recovery : without such proof, the plaintiff would have had no case. *Mitchell* v. *Cockburn,* 2 *H. Bla.* 379. *Booth* v. *Hodgson,* 6 *Term R.* 405. 409. *Cannan* v. *Bryce,* 3 *B. & Ald.* 179. (*5 E. C. L.* 255.) *Roby* v. *West,* 4 *N. Hamp.* 285. *Buck* v. *Buck,* 1 *Campb.* 547. *Simpson* v. *Bloss,* 7 *Taun.* 246. *Fivaz* v. *Nicholls,* 2 *Man. G. & S.* 501. (52 *E. C. L.* 501.) Here, the sole ground of recovery, is, the procurement of the prize money, by the false and fraudulent representations of the defendants. The plaintiffs, in making out their case, require no aid from any illegal sale or agency ; for there has been none connected with this transaction.

2. That the statute of limitations is a bar at law, notwith-standing the fraudulent concealment. *Chitt. Cont.* 817. 305. *Troup* v. *Smith's* exrs., 20 *Johns. R.* 33. 47. *Allen* v. *Mille,* 17 *Wend.* 202.

3. That the case is within the peculiar jurisdiction of a court of equity, to prevent the defendants from availing themselves of an advantage at law acquired by fraudulent concealment. *South Sea Company* v. *Wymondsell,* 3 *P. Wms.* 143. 1 *Sto. Eq.* 72. 81. 211, 2. 216. 2 *Sto. Eq.* 987. *Hovenden* v. Lord *Annesly,* 2 *Sch. & Lef.* 634. *Booth* v

Lord *Warrington*, 4 *Bro. Parl. Ca.* 163. (*Toml.* ed.,) a leading case, directly in point.

*Hungerford* and *T. C. Perkins,* for the defendants, contended, 1. That the plaintiffs' claim was founded on an illegal consideration, and could not, therefore, be recovered, either at law or in equity. *Stat.* 165. §94. (ed. 1838.) *Holman* v. *Johnson, Cowp.* 341. 343. *Simpson* v. *Bloss,* 7 *Taun.* 246. *Fivaz* v. *Nicholls,* 2 *Man. G. & S.* 500. *Hopkins* v. *Prescott,* 4 *Man. G. & S.* 577. *Hannay* v. *Eve,* 3 *Cranch,* 242. *Armstrong* v. *Toler,* 11 *Wheat.* 258. *Milne* v. *Huber,* 3 *McLean,* 212. *Wooten* v. *Miller,* 7 *Sm. & Marsh.* 380. *Roby* v. *West,* 4 *N. Hamp.* 285. *Adams* v. *Rowan,* 8 *Sm. & Marsh.* 624. 1 *Sto. Eq.* 70. 301. 303.

But it is said, that the ticket in question was *never sold*; that *Clark* never *acted as agent* in the sale of it; and there was, therefore, no illegality imputable to the plaintiffs, in this transaction. What says the bill? The agreement therein set out is to the effect, that *Clark* was the agent of the plaintiffs, at the time the lottery was drawn, and as such, received this ticket and a large number of others, to sell or return the same, or an account thereof, or of so many as should remain unsold, at the close of the sales on the day of drawing the lottery. It also appears from the bill, that the plaintiffs were responsible for the prizes to such holders of the tickets as should draw such prizes. Now, whether the tickets, after they were received by *Clark,* remained the property of the plaintiffs, or otherwise, is not a question upon which the case should turn; but the question is, whether the court will, under these circumstances, interfere in their behalf, as a court of chancery. *Clark,* under the contract of agency, as the bill states, received a large number of tickets, and held them in his hands for sale, and sold them in pursuance of *one entire agreement* with the plaintiffs: all he could sell he did sell, up to the time the lottery was drawn, and without any reservation of his authority. The money alleged to have been paid by the plaintiffs, was paid by them in direct fulfillment of the contract with the holder, or person supposed to be the holder, of the ticket; and the object of this bill, is, to recover back the money so paid. It is believed, that no authority can be found in support of such a case. In all the

cases which are to be found in the books, where, in an action of *assumpsit*, money has been recovered back, which had been put into the hands of another for an illegal purpose, the contract remaining executory, it has either been rescinded, or from the nature of the action, it was itself a rescission. It is very obvious, that the plaintiffs, to recover, must not only derive aid from the illegal contract, but they must enquire, and the court must necessarily determine, whether as between the parties, *Clark* has faithfully performed that contract on his part. *Jones* v. *Barkley, Doug.* 697, 8. 1 *Sto. Eq.* 70. *Aubert* v. *Walsh*, 3 *Taun.* 277. *Utica Ins. Co.* v. *Kip*, 8 *Cowen* 20. *Perkins* v. *Savage*, 15 *Wend.* 412.

2. That the claim of the plaintiffs, is barred, by the statute of limitations. The remedy at law and in chancery being concurrent, the statute, in both courts, operates *proprio vigore*, and is a bar in either. 1 *Chitt. Gen. Prac.* 775,6. *Armstrong* v. *Campbell*, 3 *Yerg.* 201. *Smith* v. *Carney*, 1 *Litt.* 296. *Thomas* v. *Floyd*, 3 *Litt.* 177. *Perkins* v. *Hays, Cook* 170. *(Tenn.)* *Bell* v. *Beemen*, 3 *Murph.* 273. *Roosevelt* v. *Mark*, 6 *Johns. Ch. R.* 266. *Kane* v. *Bloodgood*, 7 *Johns. Ch. R.* 90. *McCrea* v. *Purmort*, 16 *Wend.* 460. *Troup* v. *Smith's* exrs., 20 *Johns. R.* 33. *Murray* v. *Coster, Id.* 576. 585. *Humbert* v. *Trinity Church*, 24 *Wend.* 587.

3. That the appropriate remedy in this case was at law ; and a concealment of the fraud, if any, does not give jurisdiction to a court of chancery. *Baines* v. *Williams*, 3 *Iredell* 431. *Allen* v. *Harris*, 9 *Gill & Johns.* 367. *Fee's* admr. v. *Fee*, 10 *Ohio R.* 469. *Bishop* v. *Smith*, 9 *Verm. R.* 110. *Allen* v. *Mille*, 17 *Wend.* 202.

CHURCH, Ch. J. The allegations in this bill, admitted by the demurrer to be true, for the present purpose, disclose an aggravated fraud on the part of the defendants, resulting in an injury to the plaintiffs, of no ordinary amount. The first point of defence is, that, notwithstanding this concurrence of wrong and injury, there is no remedy provided, at least in a court of equity ; and is based upon the claim, that the ground of recovery has its origin in an illegal transaction—a violation of the law—in which the plaintiffs took part.

The difficulty, in this part of the case, is not so much to

determine what the true principle applicable to this subject, is, as to determine its application to the facts alleged in the bill. We suppose it to be a well settled doctrine, that, if a plaintiff requires any aid from an illegal transaction to establish his demand, he cannot recover it ; or in other words, if he is unable to support it, without relying upon an unlawful agreement between himself and the defendant, he must fail. But if the parties have been engaged in business, either *malum in se,* or merely prohibited by law; yet if the cause of action be unconnected with the illegal act, and is founded upon a distinct and collateral consideration, it will not be affected, by their former unlawful conduct. *Booth* v. *Hodgson,* 6 *Term R.* 405. Ex parte *Bell,* 1 *Mau. & Sel.* 752. *Simpson* v. *Bloss,* 7 *Taun.* 246. ( 2 *E. C. L.* 89.) *Fivaz* v. *Nicholls,* 2 *Man. Gran. & Scott,* 500. 511. (52 *E, C. L.* 500. 511.) *Bartle* v. *Coleman,* 4 *Peters* 184. *Faikney* v. *Reynous,* 4 *Burr.* 2069. *Armstrong* v. *Toler,* 11 *Wheat.* 258.

The lottery from which the ticket in question was issued, was legally granted, by the legislature of *Rhode-Island* ; and the defendant, *Clark,* was constituted, by the plaintiffs, the managers, their agent for the sale of tickets. *Clark* resided in *Hartford,* in this state ; and this ticket, with others, remained in his hands unsold, after the drawing of the lottery, and was then the property of the plaintiffs. Subsequently to all this, and while the ticket remained in the hands of *Clark,* not as the plaintiffs' agent to sell, but as a mere depository, to return on demand, the transaction took place, of which the plaintiffs complain.

The bill does not expressly allege, nor is it necessarily to be inferred from it, that *Clark* actually sold, or offered to sell, any tickets in this lottery ; or that it was intended he should offer them for sale in this state, and thereby violate any law of the state. But yielding the contrary to the claim of the defendants, and granting that the plaintiffs, by constituting *Clark* their agent in this state, had violated the statutes of the state prohibiting lotteries, and the sale of foreign lottery tickets ; a majority of the court are not persuaded, that, for this cause, the plaintiffs are without remedy.

*Clark* was only an agent of the plaintiffs to sell tickets in a lottery *to be drawn ;* his powers were necessarily restricted to this ; and as soon as the drawing was completed, his pow-

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

ers ceased, and his agency as completely terminated, as if destroyed by an express revocation. If there had been any illegal connexion between the plaintiffs and *Clark* before, now it ceased, and a new relation existed. The plaintiffs had forfeited no right of property in the unsold tickets, and *Clark* had acquired none : they were only a deposit in his hands. It was under this new relation, that the acts were committed, which are complained of, in this bill, as fraudulent. The fraudulent conspiracy between *Clark* and the *Pinneys*, was entirely independent of any statute provisions in this state, regarding the sale of foreign tickets ; and the fraudlent conduct of these parties, resulting from the combination, and producing the serious injury charged, was perpetrated in *Rhode-Island*, whose laws did not condemn, but sanctioned, every thing which had been done by the plaintiffs. Suppose *Clark* had used the ticket for any other unlawful purpose affecting the plaintiffs ; as if by a forgery, he had so altered it, as to resemble a ticket in some other class of the same lottery, and in this way had abstracted money from the plaintiffs, would the law deny a remedy ? We think not. Indeed, we see no necessary connexion between the original agency of *Clark*, as the plaintiff's lottery broker, and the subsequent frauds of *Clark* and the other defendants, by which this large amount of money has been fraudulently obtained.

We do not admit the claim of the defendants, that this bill cannot be sustained, without proving and relying upon what is claimed to be the original illegality of *Clark's* agency, apparent from the allegations in the bill. Such allegations were made, as is often done in common law pleadings, only as inducement, or a historical introduction to the material and traversable parts of the bill.

2. A further objection to this proceeding is, that the remedy at law is adequate, by an action of *indebitatus assumpsit*. There is no doubt but such an action could have been sustained, in a case like this ; but from this it cannot be assumed, that a court of law would have exclusive jurisdiction. Fraud, here, lies at the foundation ; it is the ground of complaint, and the plaintiffs seek relief from its effects. Lord *Hardwicke* has said, that a court of equity has undoubted jurisdiction to relieve against every species of fraud. Chancellor *Kent* too, lays it down as a principle, that fraud and damage,

*Hartford,*
*June, 1849.*

*Phalen*
*v.*
*Clark.*

coupled together, will entitle the injured party to relief, in any court of justice. The leading case of *Booth* v. Lord *Warrington*, 4 *Brown's Parl. Cas.* 163. (*Toml.* ed.) in this feature, cannot well be distinguished from the present. *Evans* v. *Bucknell*, 6 *Ves.* 174. *Bacon* v. *Bronson*, 7 *Johns. Ch. R.* 194. 1 *Sto. Eq.* 195. But if a case sounds in damages merely, a court of equity cannot often have occasion to interfere. *Russell* v. *Clark's* exrs., 7 *Cranch* 69. *Hardwick* v. *Forbes'* admr. 1 *Bibb* 212.

In the present case, the plaintiffs claim, that the reasons are imperative why this court should perform its legitimate duty in relieving against the fraud charged. The bill alleges, that the defendants carefully and fraudulently concealed all knowledge of the truth of the facts complained of, from the plaintiffs, for a period of more than six years, whereby the statute of limitations, by their fraud, bars a recovery in a court of law.

We forbear to determine the question, whether an action at law, under such circumstances, would be barred, or not; being aware of the conflicting opinions expressed on this subject, and especially of the adjudged cases in the state of *New-York*. *Troup* v. *Smith's* exrs., 20 *Johns. R.* 33. *Leonard* v. *Pitney*, 5 *Wend.* 30. *Allen* v. *Mille*, 17 *Wend.* 202. *Humbert* v. *Trinity Church*, 24 *Wend.* 587. These cases have proceeded upon the ground, that, as fraud is not among the saving exceptions of statutes of limitation, a court of law cannot regard it as such, and must, therefore, disregard a replication of fraud made to a plea of the statute. With such a weight of authority sustaining that principle, we cannot, with propriety, turn the plaintiffs round to a court of law, to try the experiment of a remedy there; and especially, as the defendants do not admit that any such replication to a plea of the statute of limitation, would be available.

The question, therefore, for us, must be, are the facts alleged in this bill sufficient to justify this court in affording the relief prayed for, notwithstanding the lapse of time? Or, under what circumstances will a court of equity disregard the statutes of limitation? These statutes do not, in terms, extend to any but actions or proceedings at law; and generally, the particular forms of action to which they apply, are specified. In analogy to these, courts of equity often act,

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

and especially in cases where lapse of time will be productive of the same evils in the application of equitable, as of legal remedies. And furthermore, courts of equity consider these statutes as obligatory upon them, when they are called upon to enforce only legal rights, as otherwise, their effect would be eluded, by a mere change of forum. *Troup* v. *Smith's* exrs., 20 *Johns. R.* 33. *Elmendorf* v. *Taylor,* 10 *Wheat.* 152. *Cholmondeley* v. *Clinton* & al. 2 *Jacob & Walker,* 1. *Roosevelt* v. *Mark,* 6 *Johns. Ch. R.* 266.

While we concede the full effect of the foregoing principles, we deny their application, by courts of equity, to cases of fraud like the present—cases where a defendant, by his own fraudulent acts and representations, has allayed all reasonable suspicion of his original fraud, and thus attempted to obtain an unconscientious advantage, by a lapse of time. To yield such advantage to a defendant, would be to disregard the most prominent ground of equitable jurisdiction, and to permit the hands of that court to become bound, by the very fraud against which it ought to afford relief. We do not say, nor do we intend to admit, that a court of equity has jurisdiction, because a remedy at law has been lost, by the running of the statute of limitations; or by reason alone, that a party has remained too long ignorant of his rights; but we believe, from authorities, and more than all, from the weight of moral and equitable principles, that the fraud of the defendants, as set forth in this bill, ought to deprive them of the aid of the statute, especially in a court of equity.

If the legal title to my estate be endangered, or even if a cloud be thrown over it, by the fraud of another, no one denies the power of a court of equity to give me relief: and if the rights which I have to a legal remedy to establish such title, be defeated, by a like fraud, is not the principle the same? It is an ordinary branch of equity power to enjoin a party from prosecuting or defending, in consequence of an unconscientious advantage obtained over his adversary, either by fraud, accident or mistake. The direct effect of this bill, is but enforcing the same principle, in a different form. It is but saying to these defendants, you shall not shield yourselves behind the statute of limitations, where your own fraud has placed you. *Eden on Injunctions,* 14. *Carrington* v. *Hollabird,* 19 *Conn. R.* 84.

A review of some of the cases decided, both in *England* and in this country, we think, will sustain the doctrine we advance. As early as the year 1714, the principle was enforced in the highest court of *England,* in the case of *Booth v.* Lord *Warrington,* 1 *Brown's P. Ca.* 445. 4 *Id.* 163. before referred to. That was a case, in which, by the fraudulent representations of the defendant, the plaintiff had been induced to believe, that at his request the defendant had paid, or was bound to pay, a large sum of money, to procure for him a marriage with a lady of fortune. The marriage took effect ; and the plaintiff, led by the continuous misrepresentations of the defendant, paid to him the money stipulated. Nine years afterwards, the original fraud and subsequent management to delude the plaintiff, was discovered ; and then it was ascertained, that the defendant had neither paid, nor was bound to pay, a farthing, on account of the marriage. The plaintiff then exhibited his bill in chancery, to have the money, thus fraudulently obtained from him, restored. The defendant pleaded the statute of limitations ; and the questions propounded for argument were—First, whether an action at law could be maintained to recover damages for this fraud ? Secondly, if it could, at what time did the cause of action accrue ? Thirdly, whether, supposing the fraud had not been discovered, until after the expiration of six years from the accruing of the cause of action, a court of equity, after that time, could give relief ? And upon the argument, the bill was sustained, and the doctrine claimed by the plaintiffs here, recognized. That case has since been cited with approbation, by jurists and by courts. 2 *Sto.Eq.* 739. *Sherwood* v. *Sutton,* 5 *Mason,* 143. Lord *Redesdale,* in the case of *Bond* v. *Hopkins,* 1 *Sch. & Lef.* 429. declared, that where a title exists at law and in conscience, and the effectual exertion of it at law is unconscientiously obstructed, relief should be given in equity. And the same judge, in *Hovenden* v. Lord *Annesley,* 2 *Sch. & Lef.* 634. says, " that the reason why the statutes of limitation in case of the *defendant's fraud,* ought not to prevail in a court of equity, is, that the conscience of the party, being so affected, he ought not to be allowed to avail himself of the length of time."

In *Cholmondeley* v. *Clinton,* 2 *Jac. & Walker,* 141. it

was holden, that, in case of an equitable estate, " the statute of limitations would be a bar where there *has been no fraud* ;" and in *Troup* v. *Smith's* exrs. 29 *Johns. R.* 47. *Spencer*, Ch. J. says, in allusion to the before mentioned doctrine of Lord *Redesdale :* "this is very intelligible and sound doctrine, in a court of equity ;" and that courts of equity are perfectly right in saying, "that a party cannot in good conscience avail himself of the statute, *when by his own fraud*, he had prevented the other party from coming to a knowledge of his rights." In the case of *Sherwood* v. *Sutton*, 5 *Mason*, 143. the same doctrine is very distinctly and fully recognized, and is said to apply, as well to cases in which the jurisdiction of courts of law and equity is concurrent, as to such as are exclusively of equitable cognizance. The supreme court of the *United States*, in *Michoud* v. *Girod* & al., 4 *Howard*, 561. in discussing this subject, say : " In a case of actual fraud, we believe no case can be found in the books, in which a court of equity has refused to give relief, in the life-time of either of the parties upon whom the fraud is proved." *The First Massachusetts Turnpike Co.* v. *Tidd*, 3 *Mass. R.* 201. was an early and well considered case, and has been noticed and approved, by many other cases in this country, in which the Chief Justice says : " If this knowledge is fraudulently concealed from the plaintiff, by the defendant, we should violate a sound principle of law, if we permitted the defendant to avail himself of his own fraud." To the same effect are the cases of *Homer* v. *Fish*, 1 *Pick.* 435. *Weller* v. *Fish*, 3 *Pick.* 74. *Jones* v. *Conway*, 4 *Yeates* 109. *Bishop* v. *Little*, 3 *Greenl.* 405. These were actions at law, in which fraud was replied to pleas of the statute of limitations ; and if we should disregard them as governing authorities in a court of law, as has been done the courts of the state of *New-York ;* yet we cannot disregard the great principles of equity contained in them, and which it is the clear duty of a court of equity to apply and enforce.

Elementary writers of acknowledged authority, have recognized this doctrine as the settled law. 2 *Sto. Eq.* 738. 2 *Sw. Dig.* 233. *Fonbl. Eq.* 262. *in notis.* 1 *Daniel's Ch. Pl. & Pr.* 611. 2 *Id.* 736. 2 *Greenl. Ev.* 448.

We perceive no good reason why this principle should be

*Hartford,*
June, 1849.
────
Phalen
*v.*
Clark.

*Hartford,*
*June, 1849.*

*Phalen*
*v.*
*Clark.*

discarded by courts of equity, when acting on subjects of which courts of law might have a concurrent jurisdiction; because, as is said by *Story*, J., in the before cited case of *Sherwood* v. *Sutton*, " cases of fraud form an implied exception, to be acted upon by courts of law and equity, according to the nature of their respective jurisdictions." And this is aptly elucidated, by a case put by *Chitty*, in 1 *Chitt. Gen. Pr.* 776. " Thus, suppose more than six years have elapsed since a bill of exchange became due, and it has been lost, and therefore relief is sought in a court of equity; the statute of limitations would be a bar there, as much as in a court of law, unless there were some circumstances of fraud, justifying an exception." Such an exception, we think, is entirely justified, in the present case. We have seen no judicial opinion, anywhere expressed, adverse to these views, except that of Justice *Cowen*, in *Humbert* v. *Trinity Church*, 24 *Wend.* 587. in which he insists, if a court of equity acts concurrently with a court of law, that in such court, the statute of limitations is a good defence, although pleaded in protection of fraud. It does not appear, that any other member of the court entertained the same views. And it must strike the moral sense strangely, as it seems to us, if it be true, as was said by, *Spencer*, Ch. J., " that a party cannot, in good conscience, avail himself of the statute of limitations in a court of equity, when, by his own fraud, he has prevented the other party from coming to a knowledge of his rights," if the same court will allow conscience to be perverted, if it so happen, that a court of law can act concurrently on the same subject! Or, in other words, if such court must say, we will defeat and restrain fraud, if it come to pervert equitable interests alone; but if it be practiced to subvert rights which are both equitable and legal, we will not interpose!

A majority of the court are of opinion, that the bill is sufficient.

In this opinion WAITE, STORRS and HINMAN, Js., concurred.

ELLSWORTH, J. The facts stated in this bill, if true, present a very strong case of equity in favour of the plaintiffs. But if the transaction is a manifest violation of the law of the

state, no equitable consideration should induce us to give to it our judicial sanction, or to rescue from merited loss, those who have trampled on the law of the land.

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

The legislature have, in clear and expressive enactments, utterly forbidden all lotteries, lottery agencies, lottery offices, and whatever may be an auxiliary in the sale of lottery tickets. The whole are driven from the state. They have no sanction or tolerance here. Nor can we be invaded, with impunity, from abroad. In my judgment, these plaintiffs and defendants stand alike exposed to the penalties of the law, and alike without right to supplicate our aid for redress.

After much reflection, I am unable to agree with my learned brethren in the opinion and judgment just expressed, while, I trust, I have an equal abhorrence with them, of the fraudulent conduct imputed to the defendants. The difference between us consists in the different views we take of the transaction.

I lay it down as an important position in this opinion, that the plaintiffs cannot succeed, without proving the substantial facts set forth in their bill,—not isolated parts of them, but substantially the whole, as one single transaction, each part lending essential aid to every other and to the whole. The distinguished counsel of the plaintiffs have not inadvertently encumbered this record with useless matter. They were aware of the difficulties to be encountered, and have carefully avoided every material statement or averment not essential, in their judgment, to their recovery. They have designedly stated their own case; and we may hold them to the proof of it, and the consequences and character of it.

The facts are substantially these. The plaintiffs were owners of a lottery in *Rhode-Island*; they employed *Clark*, one of the defendants, in the city of *Hartford*, to sell their tickets; and for that purpose, from time to time, sent him tickets, and among them, the ticket in question. *Clark* sold tickets, and made daily returns to *Providence*, of the sales of the preceding day, at his agency in *Hartford*. By the mail of *Monday*, the 18th day of *January*, he returned a sale of this ticket, as having been made, at his agency, on *Saturday* preceding, to *Gaylord Pinney*. The plaintiffs received this return, and *acting upon it as true*, paid the prize, a few days

after, to *Gaylord Pinney,* or his agent, *A. S. Beckwith;* the ticket being presented to them, at *Providence,* and payment demanded, according to the terms thereof. They then proceed to say, that the ticket was not sold on *Saturday,* but remained their property when it was drawn; that *Gaylord Pinney* never really owned it, but held and presented it for payment, for the benefit of *Clark.*

Upon these facts, I think the plaintiffs are not entitled to relief, and that the questions of *right* and *jurisdiction,* are properly raised on demurrer. In paying the prize ticket, when it was presented for payment by the holder, they did no more than they promised to do, and intended to do, when they sent the ticket to *Hartford,* to be sold; though it is true, they knew of no fraud in the transfer of the ticket. But is this material? I think not. The claim stated, is not so much for the isolated fact of paying money, ignorantly, as it is for fraud in *Clark* in putting off the ticket and making a false return, which they adopted as true, and thus paid the prize to the wrong person, as they say. From the first, the plaintiffs *intended* to carry out the sale as *returned*— as a sale made by their agent in *Hartford,* on the 16th of *January,* to sanction and *perfect* it, and crown it with success, by paying the prize money. If they suffer loss in the premises, it is by reason of fraud in their agent. This is the *real transaction :* it is money *paid ;* a *consideration executed* in an unlawful affair, and not, as said, the isolated and innocent payment of money through fraudulent pretences.

The plaintiffs claim to dissect the transaction, and to sue to recover back their own money. This is not their case, as stated; but they rest, and must rest their right to recover, on fraud in their agent—fraud in a forbidden agency. They have seen fit to put such a case on the record; and they must, as I have before said, make it out in proof. Much has been said about the payment of the money in *Providence,* where the lottery and selling of tickets is lawful; but this can make no difference : the payment is an act in the progress and *consummation* of the illegal enterprise against the laws of *this* state. Suppose the ticket had been honestly sold to *Gaylord Pinney,* on *Saturday,* as it was returned to be; then the payment would be good, and a mere carrying out and consummating of the agency; so that the case must turn

upon the *character* of the transfer by *Clark*,—upon the fidelity of *Clark*, or rather his want of fidelity ; which brings the case to a claim against an agent for a breach of trust. There is a trust forbidden ; the lottery is forbidden ; the agency is forbidden ; the sale is forbidden ; the return of the sale, the adoption of it, the payment of the ticket sold in *Connecticut*, if not forbidden, are all destitute of merit, in the eye of the law, and can lay no foundation for a claim in *our* courts of justice.

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

Let me illustrate my views, by a few analogous cases. Suppose *A* issues notes in the form of bank bills, to be used as a general currency, (which is contrary to the statute,) and puts them into the hands of *B* to circulate ; and he circulates them, and one is presented to *A*, by some stranger, to be redeemed, and *A* redeems it ; can *A* sue *B* or the stranger, to recover back the money as *his*, because *B* put the bill into circulation fraudulently, or only *nominally?* Suppose a person employs another to circulate through the state licentious books, for a commission for sales and for appointing sub-agents ; and the person makes return, that so many books are sold, and so many sub-agents appointed ; and is paid accordingly, by his employer : can the money be recovered back, upon discovering that this is all a pretence ? Or if the sub-agents should call for their commission, or their wages, and should be paid ; can the money be recovered back, upon discovering that these men are not agents, but have conspired to get money falsely ? Or suppose, instead of commissions, books or some collateral articles were to be delivered to the agent or agents ; and upon a false return made and acted on, they are delivered : can they be recovered back ? Clearly not. And the title need not be changed either. The truth is, the thing done, was done to accomplish what is forbidden. The employer has kept his promise—that is the whole. The contract is *executed*—the consideration has *passed*, and the law leaves the parties where it finds them.

But let us see what the plaintiffs are to gain, by treating the payment of the money in *Providence*, as an isolated affair. The bare payment of the money raises no equity in their favour. It is rather to be presumed they owed it, and only paid their debt. We must go further back, and still further,

VOL. XX. 56

*Hartford.*
June, 1849.

Phalen
*v.*
Clark.

until, finally, we reach the very transaction disclosed on this bill. Now, I maintain, that on such a case, they cannot recover at law, in any form of action, however general, nor in equity. In *Simpson* v. *Bloss*, 7 *Taunt.* 245., the rule applicable to this class of cases is well laid down and illustrated. There money was loaned, by the plaintiff to the defendant, in anticipation of its being repaid out of moneys to be paid the parties, who had jointly won a bet at a horse race ; but the stake-holder became insolvent, and the money was never paid over to the plaintiff ; he therefore sued the defendant in *assumpsit* to pay back the money he received from the plaintiff—*i. e., the plaintiff's money.* *Gibbs*, Ch. J., in giving the unanimous opinion of the court, says : " This bet was confessedly illegal, and the defendant insists, that the plaintiff's claim cannot be supported, because it grows out of an illegal transaction. The plaintiff insists, that this demand is *collateral* to that transaction." " Here the plaintiff pays ten guineas to the defendant, who was his partner in the bet, upon a confidence that he shall get the whole bet of twenty-five guineas from *Brograve ;* and not being able to do so, he seeks by this action, to recover it back. How can he make out his claim, but by going into proof of the illegal transaction on *account of which it is paid ?* He says, the payment was on a condition that has failed ;" " and it is impossible to prove the failure of this condition, without going into the illegal contract, in which all the parties were equally concerned. We think, therefore, that the plaintiff's claim is so mixed with the illegal transaction, that it cannot be established, without going into proof of that transaction, and therefore, cannot be enforced in a court of law."

The same rule is laid down in *Fivaz* v. *Nicholls*, 2 *M. G. & S.* 500. (52 *E. C. L.*) *Tindal*, Ch. J., says, " I think this may be determined on the short ground, that the plaintiff is unable to establish his claim, as stated upon the record, without relying upon the illegal agreement originally entered into between himself and the defendant. This is an objection that goes to the very root of the action. Suppose, instead of resisting the action, the plaintiff had paid the money ; he could not have recovered it back : had he attempted to do so, he would have been met by the maxim of law, *ex dolo malo non oritur actio.* If he could not succeed in such an

action, I do not see how he can recover damages in a court of law for an injury *incidentally* resulting from the same state of circumstances, inasmuch as he must put, in the very front of his declaration, the illegal agreement to which he has been a party." *P.* 512, 3. *Maule,* J., says, " the principle has been conceded, that the plaintiff cannot recover, where, in order to maintain his supposed claim, he must set up an illegal agreement to which he himself has been a party." *P.* 513.

It appears, that in these cases, the claim was made, that the *ground* of action was collateral to the illegal transaction, independent of it, and not affected by the fraud; but the argument met with no favour from the judges. The same rule is laid down in *Roby* v. *West,* 4 *N. Hamp.* 285. *Buck* v. *Buck,* 1 *Campb. R.* 547., and, with greater or less distinctness, in the numerous cases cited at the bar. The case in *New-Hampshire* is worthy of special notice. The court say, in answer to the claim, that the transaction may be viewed in parts: " But the contract between the parties was not a simple contract of sale. The defendants contracted to employ the plaintiff as their agent to sell lottery tickets upon commission, and he contracted to be thus employed. This is the body of the contract. One of the stipulations was, it is true, that the tickets, which he did not sell nor return to the defendants, previous to a certain time, should be considered as purchased by the plaintiff. But that stipulation was only *part of an entire contract,* the main object of which was directly contrary to the statute. The parties then stand in *pari delicto;* and in such a case, the illegality of the contract renders it void." *P.* 269. "We have considered the question whether the parts of the contract may be separated, and the plaintiff permitted to recover on that part in which a sale to him is stipulated. The plaintiff cannot recover, unless he is entitled to recover upon the *whole case." P.* 290.

It was settled in *Simpson* v. *Bloss,* that the test whether a demand connected with an illegal transaction is capable of being enforced at law, is, whether the plaintiff requires any aid from the illegal *transaction,* to establish his case. In *Booth* v. *Hodgson,* 6 *Term R.* 405. 409., Lord *Kenyon,* in answering a claim similar to the one now made, says: " They say to the court, ' suffer us to garble the case, to suppress

*Hartford,*
June, 1849.

Phalen
*v.*
Clark.

such parts of the transaction as we please, and to impose that mutilated state of it on the court as the true and genuine transaction, and then we can disclose such a case as will enable our clients to recover in a court of law.' Such is the substance of this day's argument. It is a maxim in our law, that a plaintiff must show, that he stands on a fair ground, when he calls on a court of justice to administer relief to him. Now, is that the case with these plaintiffs?" " *Ashhurst*, J., the plaintiffs wish us to decide this case upon a partial statement of the facts ; thereby admitting, that if the whole can be disclosed, they have no prospect of success : but we must take the whole case together." *P*. 410. I will not add further on this point.

Then, as to the statute of limitations. I have not been able to surmount the difficulty it creates to the plaintiffs' recovery. Viewed as the plaintiffs claim the transaction should be, a mere isolated payment of money, their case is, substantially, an action at law for *money obtained by false pretences*. Such a claim, in this state certainly, belongs exclusively to a court of law. How has it found its way into a court of equity ? Has the legislature only enlarged the jurisdiction of courts of equity, by passing a statute of repose ? Is this the object of providing, that after a lapse of years, a fraudulent transaction shall not be investigated, because it may not be safely done ? This cannot be ; and yet, that argument must lead to this, as I will by and by show. Certainly, this statute is not confined to particular courts of justice, nor to particular modes of proceeding : it is binding in all courts, and in every form of legal investigation. And so stringent is its application, that an admission of the wrong is no waiver of the statute of limitations, even in equity ; nor is an admission that a debt is unpaid, a waiver of the statute, without some evidence of a new promise. And now, to avoid the statute, when fraud is charged, the claimant has only to step into a court of equity, where there is no jury, if he can only make out the fraud was *secret*, (and truly it would be a singular fraud, if it were not secret,) and he hears no more of the statute. The books are full of authority, at home and abroad, that upon mere legal rights, as this confessedly is, the statute of limitations is as perfect a bar in equity as at law. Where is this doctrine to lead us ? Are

we to go into equity for fraud in the sale of patent rights? in the sale of horses? in recommending the credit of a merchant? for secret libels? secret slander? assaults committed under the cover of darkness? But, it is said, this fraud was secret. As I have already intimated, what fraud was ever committed otherwise than secretly, and with design and coöperating efforts, that then, and afterwards, the fraud should be undisclosed? And if this removes the statute, then it becomes a dead letter. Let it be always remembered, that in this case, *nothing is alleged to have been done within eight years,* and nothing was done at the time, but what constituted the very fraud itself, or the particular mode of accomplishing it. Nothing more was done, indeed, than is to be found in the commission of any secret fraud, or secret conspiracy to do wrong. I see not but now, every right to property, or claim for damages, even ejectment for land, may, at ever so remote a period, be prosecuted in equity, if there was only, at the first, secrecy in the wrong complained of.

Many authorities have been cited on the argument of the case. They are referred to and commented upon, with signal ability, by the late judge *Cowen,* in his opinion, in *Humbert* v. *Trinity Church,* 24 *Wend.* 587. 593. 619., where this equitable doctrine is discussed and decided, without a dissenting voice, so far as appears, at great length. He confidently asserts, that there is no case to be found, where a mere legal right has been sustained in equity, after the statute has run, because of secrecy, and contrived secrecy, in the original fraud.

The cases in *England* and in this country, are not harmonious, nor easily reconcilable. I will only say, that in the absence of any decision in this court, I choose to adopt the views herein briefly expressed, as most reasonable, and I think, most in harmony with established principles of law and equity.

### Judgment reversed. (*a*)

(*a*) After the reversal of the judgment of the superior court, the cause was entered in that court for trial, and a committee were appointed to find the facts. On a subsequent hearing before the committee, *Gaylord Pinney,* mentioned in the bill, was called, by the plaintiffs, as a witness, and was examined by them. The hearing being then postponed until the next, or a future day, for a further examination, the witness could not be found; whereupon the plaintiffs withdrew their suit.